**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0072n.06

Nos. 09-4253, 09-4255

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Jan 20, 2012*

LEONARD GREEN, Clerk

| | |
|---|---|
| MICHAEL WILLIAMSON, et al., | ) |
| | ) |
|     Plaintiffs, | ) |
| and | ) |
| | ) |
| DISPATCH PRINTING COMPANY; | ) |
| DONALD D. FANTA, | ) |
| | ) |
|     Plaintiffs-Appellees, | ) |
| | ) |
| v. | ) |
| | ) |
| RECOVERY LIMITED PARTNERSHIP, et al., | ) |
| | ) |
|     Defendants, | ) |
| and | ) |
| | ON APPEAL FROM THE UNITED |
| W. ARTHUR CULLMAN, JR.; MICHAEL J. FORD; | STATES DISTRICT COURT FOR |
| GILLMAN D. KIRK, JR.; THOMAS G. | THE SOUTHERN DISTRICT OF |
| THOMPSON; JAMES F. TURNER, | OHIO |
| | ) |
|     Defendants-Appellants. | ) |
| | ) |
| MICHAEL WILLIAMSON, et al., | ) |
| | ) |
|     Plaintiffs, | ) |
| and | ) |
| | ) |
| DISPATCH PRINTING COMPANY; | ) |
| DONALD D. FANTA, | ) |
| | ) |
|     Plaintiffs-Appellees, | ) |
| v. | ) |
| | ) |
| RECOVERY LIMITED PARTNERSHIP; | ) |
| COLUMBUS EXPLORATION, L.L.C., | ) |
| | ) |
|     Defendants-Appellants. | ) |

Nos. 09-4253, 09-4255
*Williamson, et al., v. Recovery Ltd. Partnership, et al.*

**BEFORE: MERRITT, COOK, and WHITE, Circuit Judges.**

**PER CURIAM.** In these consolidated appeals, Defendants appeal the district-court order

finding them in contempt and awarding $234,982 in costs and attorney fees against them jointly. We

**AFFIRM** the finding of contempt and award of damages as to Defendants Columbus Exploration,

L.L.C. (CX), and Recovery Limited Partnership (RLP), and as to the individual Defendants, with the

exception of W. Arthur Cullman.

**I.**

In September 1988, a sunken pre-Civil War steamship, the S.S. *Central America*, was located

and recovered in the Atlantic Ocean, having sunk in a hurricane off the coast of South Carolina in

1857. A large commercial shipment of gold was recovered from the wreckage. *See Columbus-*

*America Discovery Grp. v. Atlantic Mut. Ins. Co.*, 56 F.3d 556, 561 (4th Cir. 1995), *aff'd in part,*

*vacated in part*, 203 F.3d 291 (2000). Following several trials and appeals in that *in rem* proceeding

in admiralty, the plaintiff salvor, Columbus-America Discovery Group (CADG), was awarded 90 %

of the recovered treasure, and the insurance companies claiming subrogated interests in the recovered

treasure some portion of the remainder.

Defendant CX, a Delaware corporation, and its affiliate, Defendant RLP, an Ohio limited

partnership, are referred to as "Defendant Entities." Defendant Thomas G. Thompson organized

RLP in 1985 to finance a search-and-recovery project for the shipwreck of the *S.S. Central America,*

and is its general partner as well as chairman of CX . Defendants Gilman D. Kirk, Jr., Michael J.

Ford, James F. Turner, and W. Arthur Cullman, Jr., are other directors of CX and managers of RLP

(collectively with Thompson, "Defendant Directors").

Plaintiffs Dispatch Printing Company, an Ohio corporation, and Donald C. Fanta (Plaintiffs) are investors in and members of CX, and limited partners of RLP. Dispatch Printing Company invested $1 million in RLP and Fanta invested $500,000 in the project ($250,000 in RLP, and $250,000 in CX's predecessor).

Columbus-America Discovery Group (CADG), an Ohio corporation not a party to these appeals and the plaintiff in the Fourth Circuit case, acted as agent of the Defendant Entities with respect to transactions at issue in these appeals. CADG is under the direction and control of the individual Directors who are defendants in these appeals. CX's and RLP's counsel represented CADG in the Fourth Circuit case, *Columbus-America Discovery Grp.*, 56 F.3d 556.

The three suits[1] underlying the instant appeal were filed in 2005 and 2006 in the Court of Common Pleas for Franklin County, Ohio, and were consolidated. Defendants removed the action to the Southern District of Ohio on April 24, 2006.

**A.**

Plaintiffs' complaints alleged that Thompson and Defendant Directors organized RLP in the mid-1980s, and organized CX in 1998 to take over from RLP the recovery, marketing and sale efforts for the treasure. At Defendant Directors' direction, RLP transferred its salvage rights to CX

---

[1]Plaintiffs' first complaint named CX, RLP, Director Thompson, and Econ Engineering Assoc., sought an accounting, and alleged breach of limited partnership agreement and operating agreement, and breach of fiduciary duty. Plaintiffs' second complaint named Defendant Directors and alleged breach of fiduciary duty. The third suit was brought by seven plaintiffs (Williamson Plaintiffs), not parties to this appeal, against RLP, CX, Defendant Directors, and various others, seeking an accounting and alleging breach of contract for the defendants' failure to pay the plaintiffs a share of the total treasure, conversion, constructive trust, and breach of fiduciary duty.

for the treasure already recovered (Up Treasure), more than one ton of gold and silver, and other artifacts, as well as the treasure remaining at the shipwreck (Down Treasure), in exchange for an additional ownership interest in CX for RLP and its partners. Thereafter, at Defendant Directors' direction, CX took over from RLP the management of operations to market the Up Treasure and also the financing, recovery and marketing efforts regarding the Down Treasure.

Plaintiffs' amended complaint alleged that starting in 1999, Defendants began a series of wrongful maneuvers to take control of the companies and treasure to the exclusion of their minority investors, including deliberately abandoning all corporate formalities, refusing to hold annual meetings to elect new directors, refusing to provide investors with financial statements, and wasting millions in assets through self-dealing transactions. The amended complaint also alleged that Thompson and the other Defendant Directors owed fiduciary and other duties to Plaintiffs, and that by virtue of their failure and deliberate refusal to maintain corporate formalities and proper governance process, as well as other conduct, the Defendant Directors are the alter egos of CX and RLP for liability purposes and personally liable for obligations and liabilities owed Plaintiffs by CX and RLP.

After Defendants removed the action to federal court in April 2006, the parties filed numerous motions, including cross-motions for injunctive relief. Following a settlement conference and 10 1/2 hours of court-led mediation on July 10, 2006, the district court ordered a review of CX's and RLP's financial affairs from 2000 to date by KPMG, a forensic accounting firm Plaintiffs retained.

**B.**

On July 20, 2006, the district court entered a Consent Order that provided in pertinent part:

1.      Plaintiffs' claims against Defendants for injunction to compel production of financial and business records of CX and RLP, and for accounting of the companies' financial affairs, are hereby fully and finally resolved and adjudicated in accordance with the terms and conditions of this Order. . . .
. . . .
3.      Within sixty (60) days after entry of this Order, Defendants shall provide Plaintiffs' accountant [KPMG] (hereafter, the "Accountant") with full access and opportunity to review the documents and materials *regarding the period from January 1, 2000 through the date of entry of this Order, identified in the July 11, 2006 list*[2] *by Accountant, for the purpose of preparing a report (hereinafter, "Report") of the financial affairs and condition of CX and RLP.*

*Defendants shall make available to the Accountant upon request all documents in response to paragraph 25 of the Accountant's July 11, 2006 letter regardless of their date. The preceding sentence shall not otherwise enlarge or contract the scope of the documents reviewable by the Accountant.*

4.      All documents and materials *identified* in the July 11, 2006 *list by the Accountant* shall be produced by Defendants to Accountant, provided, however, that individual personal information . . . may be redacted . . . Defendants shall make the documents *listed* in the Accountant's July 11, 2006 letter available to the Accountant at CX's Ohio office, or at the Ohio office of CX's accountants. Defendants and their accountants shall provide reasonable cooperation and assistance to the Accountant [KPMG] in connection with its Report.

5. The Accountant [KPMG] will not copy or retain any documents produced by Defendants, or any excerpts or summaries thereof, except to the extent necessary to maintain a file of work papers . . . in support of its Report, in which event the Accountant's Work Papers will be submitted to the Court under seal at the time that the Accountant delivers its Report to the Court. Subject to further order of the Court that may be appropriate to address future evidentiary and procedural issues, the Court will retain the Accountant's Work Papers until conclusion of all further proceedings

---

[2]D. Eric Stovall, a principal and lead forensic accountant of KPMG, sent the July 11, 2006 letter.

. . . at which time the Accountant's Work Papers shall be destroyed or returned to Defendants.

6. Plaintiffs will bear the costs (a) of the Accountant's review and preparation of the Report, and (b) incurred by CX pursuant to the CX Operating Agreement § 9.02(b).

7. All communications between the Accountant [KPMG] and Defendants' accountants in connection with the Report will remain confidential, and will not be shared with counsel or the Parties, subject to the right of any Party to this Consent Order to apply to the Court for disclosure of such communications for good cause shown.

8. The Accountant [KPMG] shall conduct its review of CX and RLP, and prepare and maintain its Report thereof, in the strictest confidence, and shall not disclose its Report, Work Papers, or any information obtained from Defendants in connection with Report, to any persons other than the Court, subject to the right of any Party to this Consent Order to apply to the Court for disclosure of the Accountant's Report, Work Papers, or other information obtained by the Accountant in connection with its Report, for good cause shown, and subject to such protective orders as the Court deems appropriate.

. . . .

18. Except as provided in Paragraph 6 of this Order, each Party to this Consent Order shall bear its own costs and attorney fees incurred to date.

19. This Court shall retain continuing jurisdiction to administer and enforce this Order, *and determine information to be made available to the Accountant consistent with this Consent Order, and further to determine any issue of claimed attorney-client privilege.*

R. 84/Consent Order at 3-4, emphasis in original.

Section 9.02(b) of CX's Operating Agreement, cited in ¶ 6 of the Consent Order, provides:

The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member at any and all reasonable times during normal business hours. Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records.

After entry of the July 20, 2006 Consent Order, Plaintiffs filed five motions for contempt, asserting that Defendants failed to comply with the Consent Order and other orders.  Although the district court denied Plaintiffs' motions, it found that Defendant Entities had violated the Consent Order and other orders, and reserved the issue of sanctions.  For example, the district court's opinion and order of December 5, 2006 noted:

> 1.  Defendants CX and RLP have violated the express terms of the July 20, 2006 Order.  The record in this case shall be kept open regarding this violation.  The Court reserves for a later date sanctions or other remedies with regard to such violations.

Another example is the court's February 7, 2007 order, which denied without prejudice Plaintiffs' motion to hold  Defendants in contempt for failure to comply with a February 1, 2007 order.

On October 16, 2007, Plaintiffs moved for damages for violations of the Consent order and other orders, seeking approximately $400,000 in fees for KPMG, and legal fees.[3]  The district court found Defendants in contempt and awarded damages against them collectively of $193,892 in accounting fees and $41,090 in attorney fees against them collectively.  Both sets of Defendants timely appealed and the appeals were consolidated.

### C.

In Docket No. 09-4255, Defendant Entities raise a host of issues, including that the district court reversibly erred in failing to apply *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 550-51

---

[3]Plaintiffs filed an amended complaint in December 2008.  The district court remanded their claims to the Franklin County Court of Common Pleas, but retained jurisdiction under the terms of the Consent Order to resolve all outstanding matters governing the audit and settlement agreement.

(6th Cir. 2006), under which ambiguities in the order allegedly violated must be interpreted in favor of the alleged contemnor. Defendant Entities also challenge the damages award.

In Docket No. 09-4253, Defendant Directors assert that the district court erred in holding them liable for acts and omissions of Defendant Entities' counsel and accountant, erred in failing to recognize the impossibility of compliance by Defendant Directors, and erred in its calculation of damages, among other things.

## II.

The order from which this appeal was taken resulted from cross-motions – Plaintiffs' Motion for Damages filed on October 16, 2007, which argued that Defendants violated court orders in ten instances, and Defendants' motion for an order of satisfaction. The district court granted Defendants' motion, and granted Plaintiffs' motion in part, finding two instances of willful failure to comply with its orders. The first was Defendant Entities' failure to timely deliver to KPMG documents described in paragraph 3 of the Consent Order [documents and materials regarding the period from January 1, 2000 through July 20, 2006, identified in KPMG's July 11, 2006 list], and the second was Defendant Directors' failure to show that they were unable to comply with the Consent Order.

### A.

The district court's Opinion and Order sets forth the backdrop and its prior rulings:

> By the terms of the Consent Order, the financial documents to be produced by the Defendants and reviewed by an accounting firm were identified in a letter dated July 11, 2006 and prepared by KPMG, which was retained by the Plaintiffs to undertake the review. The July 11, 2006 letter was expressly referenced in the Consent Order as defining the type of records to be reviewed. The letter listed

twenty-five categories of documents to be produced and stated in the penultimate sentence:

> The above list will undoubtedly be substituted by additional document, record, and/or information requests in the future.

From the start, a portion of the documents required to be produced was undoubtedly not defined with precision.

Initially, the Court cannot ignore the contentious nature of this case. The docket in this case reveals the filing of over 470 documents, more than one every two business days over a period of two years and nine months. In many instances, the Court is convinced that matters raised in motions could have been resolved with far less expense and court intervention, if the parties and counsel had made good efforts at reaching an accommodation. This is particularly so given that, from the start, KPMG indicated that other records, then undefined, would be needed.

Before a more precise review of the issues raised, a few general observations are in order. First, the Consent Order expressly provides that the "Plaintiffs will bear the costs (a) of the Accountant's review and preparation of its Report, and (b) incurred by CX pursuant to the CX Operating Agreement § 9.02(b)." (Order, July 20, 2006, ¶ 6). This Court has noted that Ohio law, with reference to RLP, and Delaware law, with reference to CX, requires those entities, independent of the Consent Order, to make available much of the information sought by KPMG. In this action for an accounting, however, the parties agreed that the Plaintiffs would bear the cost of the financial analysis. Consequently, only if the Defendants are in violation of the Consent Order are the Plaintiffs entitled to recover their costs associated with the financial review. Whether such information should have been forthcoming in timely annual reports is an issue for another day and another court.

Second, the agreement originally made by the parties became a Court Order on July 20, 2006. Willful violation of the agreement, therefore, becomes a willful violation of a Court Order, with resulting sanctions, including an award of costs and fees. In contrast, one party's bonafide interpretation of an ambiguous term of the Order, although rejected by the Court, does not constitute willful disobedience of a court order, if the party ceases such conduct following a contrary judicial interpretation of such term.

Third, before a finding of contempt may be entered, a party must have willfully violated a specific provision of a court order. The Court must be convinced

by clear and convincing evidence that a party has violated an order of the Court. *Glover v. Johnson*, 934 F.2d 703, 707 (6th Cir. 1991).

With those considerations in mind, the Court will review the claim of the Plaintiffs that the Defendants have willfully violated one or more orders issued in this case. Several of the precise claims made involve matters brought before the Court in earlier motions. Thus, the Court will also consider whether the Defendants acted in good faith, although in a manner later found by the Court to be an erroneous interpretation of the Consent Order. If so, then prompt compliance with the Court's interpretation of the Consent Order cannot constitute contempt.

[]

The Plaintiffs allege that the Defendants have violated Orders of the Court in seven separate instances. The claims include:

. . . .

6. Defendants' Failure to Timely Produce Inventories Regarding the Recovered Treasure.

Plaintiffs contend that the Defendants first refused to turn over the inventory of the up-treasure and, after being expressly ordered to obtain and tender the same documents, delayed delivery by more than eleven months. In the Court's view, this particular document was of critical importance in the accounting process, insofar as the inventory described property that represented the primary tangible assets of CX and RLP. Without a documented list of the assets belonging to the entities, an analysis of the business' financial status was impossible to prepare.

In May of 2007, after KPMG requested the inventory filed under seal in the []Eastern District of Virginia, Defendant-entities, through counsel, represented in open court that they would move for a limited disclosure of the inventory. This Court very specifically advised the parties in open court that the Accountants were entitled to the inventory, based upon the original terms of the Consent Order.

On September 20, 2007, the District Court in Virginia granted the Defendants access to the inventory. Nonetheless, the inventory was not tendered to the Accountants until August 8, 2008. No reasonable justification has been presented to explain this delay. For the reasons that follow, the Court finds CX and RLP in contempt of the Consent Order.

The entities raise two defenses to the delay in producing the inventory. First, they contend that, while their appeal was pending in the Sixth Circuit, they were not required to turn over the inventory. Second, the entities claim that KPMG

10

representatives refused to sign documents committing them to be bound by orders issued by the District Court in Virginia. The Court rejects both arguments.

As to the first issue, a hearing was held September 7, 2007. The Court directed counsel for the entities to obtain through the Virginia District Court a copy of the inventory of the up-treasure, filed in that Court under seal. This Court again referenced the Consent Order, which required the entities to submit for review documents "regarding the period from January 1, 2000 through the date of this Order [July 20, 2006] . . . ." As the Court made clear on September 7, 2007 and in prior proceedings, documents created before the period between January 1, 2000 and July 20, 2006, were required to be produced if such documents were "regarding the period." During the September 7, 2007 hearing, the Court reiterated its view that the inventory in the Virginia court regarded matters involved in, or even essential to, the accounting period. Further, counsel for the entities agreed during the same hearing to obtain the inventory.

On October 4, 2007, the entities filed a notice of appeal and asked for a stay of the Court's Order, which had not been reduced to writing. The stay was denied and no stay was issued by the Court of Appeals. On February 8, 2008, the Court of Appeals dismissed the appeal. The entities erroneously assert that the appeal itself obviated the obligation to comply with the Consent Order.

The entities contend that because the Court's oral pronouncement on September 7, 2007 was not reduced to writing, such order cannot be the basis for a finding of contempt. This claim is true, but off the mark. The Order from this Court requiring production of the inventory is the original Consent Order, which the entities have violated. The pendency of an appeal did not operate to stay the terms of the Consent Order.

Second, the entities contend that, until the Court issued an order on November 20, 2008, directing that KPMG comply with the orders of the District Court for the Eastern District of Virginia ("EDVA"), they could not turn over the inventory. The EDVA judge partially unsealed the inventory and required that all parties be "bound by the jurisdiction, orders and decrees of this Court." (Order, EDVA, 9-20-2007). Nothing in the Order required KPMG to sign a document prepared by the entities containing the following:

> I,_____, hereby agree to comply with all terms and conditions
> of the Court's order permitting review of the inventory of the gold
> specie recovered from the SS *Central America*. I hereby agree to be
> bound by all prior confidentiality orders of the U.S. District Court for

11

the Eastern District of Virginia. I irrevocably submit to the jurisdiction of this Court with respect to enforcement of those orders.

Further, the proposed declaration added terms not used by the EDVA, and not required by the Consent Order.

To simply break the log jam, this Court issued an Order on November 20, 2008 directing the Defendants to tender the inventory. The Order also provided that, if KPMG decided to review the inventory, it would be bound by the "jurisdiction, orders and decrees" of the District Court in Virginia. (Order, Nov. 20, 2008). The Court strongly disagrees with the entities['] contention that, until this Order, it could not disclose the inventory to KPMG. At all times since the entry of the Consent Order, KPMG has been bound by a confidentiality provision set forth in Paragraph 7.

Further, the entities received the inventory in October of 2007. The inventory was first offered to KPMG ten months later in August of 2008. Only at that time did the entities attempt to require KPMG to sign the declaration, which delayed ultimate receipt by KPMG until late November 2008.

The Court finds that the entities willfully violated the Consent Order of this Court by failing to timely deliver to KPMG documents described in Paragraph 2 [*sic* 3] of the Order. The Court also finds that the delay added significant cost and delay in completing the audit.

7. Defendants' Claim That They Do Not Possess Marketing Plans, Strategies and Sales Reports

Alexander's [Defendant Entities' CPA] work papers were sought by the Accountants [KPMG]. This Court issued an Order on April 30, 2007 directing that [his] work papers be produced. On May 17, 2007, Alexander indicated to KPMG that the work papers were ready to be sent. On May 21, 2007, counsel for the entities raised an issue of privilege, thereby preventing disclosure. On September 7, 2007, this Court orally directed that the work papers were to be given to KPMG. The documents were not submitted until August 8, 2008, eleven months later.

The entities contend that, because the oral proceeding on September 7, 2007 was not followed by a written opinion that [*sic*] they cannot be in contempt. This claim is true. What the entities fail to address is the Court's earlier order of April 30, 2007. On that date, the Order noted, "The Defendants have agreed to make available to the accounting firm the work papers maintained by Mr. Alexander." (4/30/07 Order, at p. 3.) During the same hearing, counsel for the entities stated that he "was

not aware of any privileges" relating to Alexander's work papers. (4/24/2007 Hearing Tr. Pgs. 24-26).

The April 24, 2007 hearing, which resulted in the Order of April 30, 2007, was convened to address, *inter alia*, Plaintiffs' contention that KPMG had not received a number of documents. The motion and attachments specifically complained that Alexander's work papers had not been received. (Doc. 181-2, Ex. C). The Order of April 30, 2007 resolved the dispute based upon the representation of the entities' counsel.

It is clear that, following the Order of April 30, 2007, the entities did not comply with the Court's Order for eleven months. Such delay was contemptuous and caused additional expense to the Plaintiffs.
. . . .
Once willful contempt of court is established, the Court may compel compliance and compensate the complainant. *Electrical Workers Pension Trust Fund of Local Union No. 58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 385 (6th Cir. 2003). Plaintiff[s] seek[] reimbursement for costs they incurred by way of additional fees charged by KPMG and Plaintiffs' counsel as a result of the Defendants' contemptuous conduct. Plaintiffs seek recovery of additional fees [for] KPMG in the amount of $290,838 and attorneys fees of $82,180.

The record in this case discloses several years of contentious litigation caused in major part by the refusal of the Defendants to tender documents required to be disclosed to the Accountants by the Consent Order. Shortly after the Consent Order was entered, the Court found CX and RLP in contempt for refusing to tender the inventory of the gold, records of sales, minutes of meetings, and other required documents. (Order, 12/05/06.) In the same Order, the Court reserved for a later date the issue of sanctions, in the vain hope that prompt compliance with the Consent Order would follow.

The Court acknowledges that the fees and expenses sought by the Plaintiffs include the cost of several matters that have not been found to constitute contempt of court, as determined in this Order. Consequently, Plaintiffs are not entitled to the entirety of the costs and expenses alleged. Further, as this Opinion notes, this case has been marked by a great deal of needless contention, which has no doubt added to the fees sought. As a result, there is simply no divining rod the Court can use to precisely measure the additional expenses incurred by the Plaintiffs as a result of the contempt of the Defendants.

Nonetheless, the Court is certain that the Defendants' conduct caused significant delay and expense. The accounting was sandbagged by the Defendants through a variety of means. What should have taken several months has taken several years.

The Court has also reviewed the invoices submitted and finds the expenses are billed a[t] a reasonable and customary rate. The Court concludes that the Defendants are liable for two-thirds of the accounting fees and one-half of the attorneys fees sought. The Court finds the Defendants have willfully violated the prior Orders of this Court. As sanctions for such conduct, the Defendants shall collectively pay to the Plaintiffs $193,892 for accounting fees and $41,090 in attorneys fees.

R. 480 at 2-4, 9-13, 14-16.

**B.**

We review the district court's finding of contempt for abuse of discretion. *Liberte Capital Grp.*, 462 F.3d at 550. An abuse of discretion exists where the district court relied on clearly erroneous fact-findings or applied an incorrect legal standard. *Id.*

The movant in a civil contempt proceeding bears the burden of proving by clear and convincing evidence that the respondent "violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Glover v. Johnson*, 934 F.2d 703, 707 (6th Cir. 1991). This Court requires that the prior order be "clear and unambiguous" to support a finding of contempt. *Grace v. Ctr. for Auto Safety*, 72 F.3d 1236, 1241 (6th Cir. 1996). Ambiguities must be resolved in favor of the party charged with contempt. *Id.*

*Liberte Capital Grp.*, 462 F.3d at 550-51. "Once the movant establishes his prima facie case, the burden shifts to the contemnor who may defend by coming forward with evidence showing that he is *presently* unable to comply with the court's order." *Elec. Workers Pension Trust Fund v. Gary's Electric Serv. Co.*, 340 F.3d 373, 379 (emphasis in original), citing *United States v. Rylander*, 460 U.S. 752, 757 (1983) ("Where compliance is impossible, neither the moving party nor the court has

any reason to proceed with the civil contempt action. It is settled, however, that in raising this defense, the defendant has a burden of production.").

**C**.

Defendant Entities argue that the district court failed to apply *Liberte Capital* by not examining the orders at issue to determine whether there were alternative, reasonable interpretations. Had the district court done so, Defendant Entities argue, it would have determined that the Consent Order did not clearly and unambiguously direct CX to violate the order of the District Court for the Eastern District of Virginia (EDVA). Defendant Entities assert that the Consent Order did not clearly and unambiguously require CX to a) do the impossible, or b) violate the law, e.g., produce a sealed inventory that was in the sole custody, control, and possession of the EDVA when KPMG had not accepted the express conditions for review set by the Virginia court.

**1.**

After entry of the Consent Order on July 20, 2006, the district court on December 5, 2006, and again on April 30, 2007, ordered Defendants to produce the inventory of the recovered Up Treasure. Following a hearing on September 7, 2007,

> [t]he court directed counsel for Defendant Entities to obtain through the Virginia District Court a copy of the inventory of the up-treasure, filed in that Court under seal. This Court again referenced the Consent Order . . . [and] reiterated its view that the inventory in the Virginia court regarded matters involved in, or even essential to, the accounting period. Further, counsel for the entities agreed during the same hearing to obtain the inventory.

Defendant Entities assert that shortly after the December 5, 2006 order, they provided KPMG with the only inventory in their possession, custody or control – the inventory of all gold *sold* to the

California Gold Marketing Group. This is a red herring. The contempt judgment was based on Defendants' failure to produce the inventory of the Up Treasure – the gold *recovered* from the shipwreck, not the gold *sold* to California Gold.

Defendant Entities' intertwined claim that they did not have possession, custody, or control of the Virginia inventory fails. The district court's contempt finding was for the delay between Defendant Entities obtaining the Virginia inventory in October 2007 and producing it ten months later, in August 2008. Moreover, Defendant Entities, represented by the same counsel as represented CADG, the plaintiff in the EDVA case, had the ability to obtain the Virginia inventory, and indeed, received it two weeks after asking the EDVA for it in September 2007.

**2.**

Defendant Entities also claim that their delay in producing the Virginia inventory was not contemptuous because the EDVA's September 20, 2007 order required that all persons allowed to review the inventory agree to be strictly bound by the jurisdiction, orders and decrees of the EDVA. Defendant Entities maintain that the district court in the instant case thus erred in concluding that ¶ 4 of the Consent Order satisfied the condition for review of the sealed order imposed by the Virginia district court. Defendant Entities also assert that the Consent Order's language can be interpreted in good faith as not imposing on CX a duty to disregard the condition imposed by the Virginia court for review of the inventory. They contend, further, that KPMG failed to satisfy the condition for review, and that they adhered strictly to the terms of the Virginia court's order until the district court in the instant case issued an order on November 20, 2008, which order was the first

stating that if KPMG [Plaintiffs' forensic accounting firm] chose to review the inventory, it would be deemed to be bound by the jurisdiction, orders and decrees of the Virginia court.

As mentioned, the attorney representing Defendant Entities in the instant appeal, also represented the plaintiff in the EDVA case, *Columbus-America Discovery Grp., Inc. v. The Unidentified, Wrecked and Abandoned etc., et al.*, Docket No. 2:06-cv-00292-EAS-TPK. R. 366-6. The docket sheet for the EDVA case, and other exhibits, establish that said attorney, acting as the plaintiff's counsel in the EDVA case, filed an "Unopposed Motion to Permit Plaintiff Access to Sealed Inventory" on September 7, 2007, and that the EDVA granted the motion on September 20, 2007. Along with the motion, said attorney submitted an Order, which the EDVA entered. Thus, as Plaintiffs point out, Defendant Entities' counsel himself drafted the order that Defendant Entities now seek to hide behind.

A party may not create an impediment to its compliance with a court order and then rely on the impediment as an excuse when it is held in contempt. *See Satyam Computer Servs. Ltd. v. Venture Global Eng'g, LLC*, No. 07-CV-12654-DT, 2007 WL 2080297, at *2 (E.D. Mich. July 19, 2007), *aff'd*, 323 F. App'x 421 (6th Cir. 2009) (unpublished). More importantly, Defendant Entities' purported concern regarding complying with both the Consent Order and the EDVA order does not explain why they delayed almost one year after obtaining the Virginia inventory in September 2007 to notify KPMG that they had it (in August 2008).

We also reject Defendant Entities' argument that the district court's first order complying with the Virginia court's terms was entered on November 20, 2008, and that they thus could not be

in contempt for the period preceding that date, for the above reasons and the reasons the district court

set forth:

> The EDVA judge partially unsealed the inventory and required that all parties be "bound by the jurisdiction, orders and decrees of this Court." (Order, EDVA, 9-20-2007). Nothing in the Order required KPMG to sign a document prepared by the entities containing the following:
>
> > I, _____ , hereby agree to comply with all terms and conditions of the Court's order permitting review of the inventory of the gold specie recovered from the SS *Central America*. I hereby agree to be bound by all prior confidentiality orders of the [EDVA]. I irrevocably submit to the jurisdiction of this Court with respect to enforcement of those orders.
>
> Further, the proposed declaration added terms not used by the EDVA, and not required by the Consent Order.
>
> To simply break the log jam, this Court issued an Order on November 20, 2008 directing the Defendants to tender the inventory. The Order also provided that, if KPMG decided to review the inventory, it would be bound by the "jurisdiction, orders and decrees" of the District Court in Virginia. (Order, Nov. 20, 2008). The Court strongly disagrees with the entities['] contention that, until this Order, it could not disclose the inventory to KPMG. At all times since the entry of the Consent Order, KPMG has been bound by a confidentiality provision set forth in Paragraph 7.

**3.**

Defendant Entities claim as independent bases for reversal that 1) the Consent Order can be

interpreted in good faith as not requiring production of a sealed inventory within the exclusive

possession of the Virginia court, and 2) damages could not have been caused by CX's alleged

contemptuous conduct, as the EDVA's order permitting review of the up-treasure inventory was

entered on September 20, 2007, and virtually all of Plaintiffs' damages had accrued on or before

September 30, 2007.

18

The first argument lacks merit. Even if the Consent Order could be interpreted in good faith as not requiring production of the Up Treasure inventory, as noted immediately below, the district court's subsequent order of December 5, 2006, can not. Further, there is no evidence that Defendant Entities' counsel attempted to obtain the up-treasure inventory before September 2007 or that he had any trouble obtaining it when he very-belatedly filed a motion to obtain it.

The second argument – that CX's contemptuous conduct could not have caused Plaintiffs damages – is belied by the record. It is clear that Plaintiffs'/KPMG's ability to perform an accounting was severely hampered by Defendant Entities' failure to produce the up-treasure/recovered-gold inventory until November 2008. In that regard the district court noted in December 2006:

> Two sets of key documents have yet to be tendered. The first is an inventory of the gold recovered and sold by the Defendants. . . . Further, with regard to . . . the gold inventory, at no point have the Defendants given to the Plaintiffs' accountant any written confirmation that such documents could not be found.

Later, the district court made clear at a hearing on September 7, 2007, that Defendant Entities were bound under the Consent Order to produce an inventory of the up-treasure. The declaration of KPMG's principal, Eric Stovall, dated October 15, 2007, stated that KPMG had still not been provided the inventory of the Up Treasure, and noted that without the inventory (and other documents) "it is not possible for us to provide a full and complete report on the financial condition and affairs of CX and RLP for the period identified in the Consent Order." Defendant Entities did not produce the recovered gold inventory until November 2008.

Defendant Entities' arguments thus fail.

**III**.

The district court's contempt judgment was also based on Defendant Entities' refusal to

produce the work papers of their accountant, CPA Stephen Alexander. The court's order of April

30, 2007 provided in pertinent part:

> This Court entered an Agreed Order on July 20, 2006 [the Consent Order].
> Essentially, the parties agreed, and the Court ordered, that the accounting firm of
> KPMG be permitted access to the financial records of [CX and RLP]. . . . [A] number
> of disputes have arisen which this Court has been required to resolve. As evidenced
> by the Memoranda in Support of the countervailing motions, additional issues have
> arisen regarding the precise documents reviewable by KPMG.
>
> Both motions were scheduled for hearing on April 24, 2007. After hearing
> from counsel, the accountant for the Defendants, Stephen Alexander, CPA, and a
> representative of KPMG, Mr. Eric Stovall, the undersigned acknowledged certain
> agreements made by the parties in open court and further directed that certain other
> documents be tendered to KPMG by the Defendants.
> . . . .
> The Defendants have agreed to make available to the accounting firm [KPMG] the
> work papers maintained by Mr. Alexander.

**A.**

We reject Defendant Entities' argument that their agreement regarding Alexander's work

papers "fell within the category of documents being produced pursuant to the terms of its agreement

on the record in open Court" during the hearing on April 24, 2007, and thus, that the court's order

was ambiguous. A court speaks through its written judgments and orders. *United States v. Coccia*,

598 F.3d 293, 296 (6th Cir. 2010); *Omnipoint Holdings, Inc. v. City of Southfield*, 355 F.3d 601, 606

(6th Cir. 2004). There is nothing ambiguous about the district court's April 30, 2007 order regarding

Alexander's work papers.

20

Defendant Entities bootstrap this weak argument to the argument that the district court's

September 30, 2009 opinion acknowledged that they raised an issue of privilege on May 21, 2007

as to Alexander's work papers. That is correct, but Defendant Entities fail to note that the court's

2009 opinion also stated that during the April 24, 2007 hearing, counsel for Defendant Entities stated

he "was not aware of any privileges" relating to Alexander's work papers, and that the court's April

30, 2007 order states that it resolved the dispute based on the representation of the entities' counsel.

On September 7, 2007, the district court orally directed that Alexander's work papers for

which Defendant Entities were not claiming privilege be given to KPMG, and those for which

privilege was claimed be submitted for *in camera* review. Nonetheless, Defendant Entities did not

tender to KPMG Alexander's papers for which there was no claim of privilege until August 8, 2008,

nearly one year after the court's September 7, 2007 order.

Defendant Entities also argue that their agreement acknowledged by the district court in open

court was susceptible to the good-faith interpretation that they agreed to permit KPMG's review of

Alexander's papers on the express condition that that would be the end of the review process. We

reject this claim as well; the district court spoke through its order of April 30, 2007. *Coccia*, 598

F.3d at 296; *Omnipoint Holdings, Inc.*, 355 F.3d at 606.

Defendant Entities' arguments regarding Alexander's work papers thus fail.

**IV.**

Defendant Entities next assert that the district court erred in misapplying the law governing

the imposition of damages in a civil contempt proceeding. They argue that any determination of

damages should have considered the period when the contemptuous conduct caused the losses

Plaintiffs claim, which was at the earliest April 30, 2007, when the district court found the Consent Order had been violated, and at the latest August 15, 2007, when KPMG issued its report.

**A.**

Dispatch Plaintiffs' Motion for Damages appended exhibits including a declaration of KPMG's lead forensic accountant, D. Eric Stovall, asserting that he had analyzed the additional costs KPMG incurred through August 31, 2007 as a result of Defendants' uncooperative behavior, and concluded that KPMG expended 915.9 additional hours as a result, which added $290,838 to Plaintiffs' accountant fees, and additional legal fees of $80,000, incurred in efforts to enforce Defendants' compliance with the Consent Order and subsequent related orders. Ten other KPMG employees also submitted supporting declarations.

The district court, having presided over these proceedings since late April 2006, was intimately familiar with the case's progress or lack thereof, and had reserved the issue of sanctions for Defendants' contempt as early as December 2006. The court reviewed the expenses Dispatch Plaintiffs claimed as a result of Defendants' obstreperous delays, and found that they were reasonable and billed at a customary rate.

We find no abuse of discretion in the district court's award to Plaintiffs of 2/3 of the accounting fees and 1/2 of the attorney fees sought. The district court had broad discretion to fashion an appropriate remedy for Defendants' contempt. *Gary's Elec. Serv. Co.*, 340 F.3d at 385. In a civil contempt proceeding, "judicial sanctions can be used not only to coerce compliance, but also to compensate the complainant." *Id.* "As long as the district court's view of the evidence is plausible in light of the entire record, it must stand, even though the reviewing court, had it been the finder of

fact, might have judged the same evidence differently." *Glover v. Johnson*, 199 F.3d 310, 312 (6th Cir. 1999) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985).

## V.

Defendant Entities argue that the district court "materially amended" the settlement agreement embodied in the Consent Order by 1) adding the last paragraph of KPMG's July 11, 2006 letter, 2) requiring that Defendant Entities produce the Virginia inventory of recovered gold, 3) precluding Alexander from adhering to standard professional accounting practices for the review of documents of companies whose assets included significant trade secrets, and 4) excising Plaintiffs' obligation to pay all expenses of the accounting review.

Although the Consent Order limited the required production of documents to the 25 categories listed in KPMG's July 11, 2006 letter, several of the categories were broad, i.e., not "closed universes," in that they included the language "but not limited to," e.g., "Financial statements and records for the Entities from 2000 to the present including, but not limited to, the following . . . . ." and the last paragraph of KPMG's letter (not a part of the numerical list) stated:

> The above list will undoubtedly be supplemented by additional document, record, and/or information requests in the future . . . .

Paragraphs 3 and 19 of the Consent Order stated:

> 3. [] Defendants shall provide Plaintiffs' accountant . . . with full access and opportunity to review the documents and materials *regarding the period from January 1, 2000 through the date of entry of this Order, identified in the July 11, 2006 list by Accountant, for the purpose of preparing a report . . . of the financial affairs and condition of CX and RLP.*
> . . . .

19. This Court shall retain continuing jurisdiction to administer and enforce this Order, *and determine information to be available to the Accountant consistent with this Consent Order . . .*

R. 84 (emphasis in original). As the district court's final Opinion and Order noted:

By the terms of the Consent Order, the financial documents to be produced by the Defendants and reviewed by an accounting firm were identified in a letter dated July 11, 2006 and prepared by KPMG, which was retained by the Plaintiffs to undertake the review. The July 11, 2006 letter was expressly referenced in the Consent Order as defining the type of records to be reviewed. The letter listed twenty-five categories of documents to be produced and stated in the penultimate sentence:

The above list will undoubtedly be [supplemented] by additional document, record, and/or information requests in the future.

From the start, a portion of the documents required to be produced was undoubtedly not defined with precision.

. . . .

[] from the start, KPMG indicated that other records, then undefined, would be needed.

After entry of the Consent Order, the district court reiterated that it had retained jurisdiction to administer the Order.

The subjects of Defendant Entities' second and third arguments – the inventory of the recovered gold and CPA Alexander's work papers – are addressed above. Defendant Entities' fourth argument – that the district court amended the Consent Order by excising Plaintiffs' obligation to pay KPMG's costs[4] also fails. The district court acknowledged that under the Consent Order, Plaintiffs would bear KPMG's costs, and that "only if the Defendants are in violation of the Consent Order are the Plaintiffs entitled to recover their costs associated with the financial review." The

---

[4]We reject Plaintiffs' argument that Defendant Entities waived this argument, as Defendants raised it in their Corrected Trial Brief.

district court did not amend the Consent Order, but rather, it interpreted the parties' rights and obligations thereunder. *See e.g.*, *Grand Traverse Band of Ottawa and Chippewa Indians v. Dir. Mich. Dep't of Natural Res.*, 141 F.3d 635, 641 (6th Cir. 1998) ("A district court has the jurisdiction to enforce consent decrees. Such decrees are settlement agreements subject to continued policing.") (internal quotations and citations omitted). There is no reason to believe that the court awarded the entire cost of the Accountant's review; the award represented the increased costs due to Defendant Entities' contemptuous conduct.

### Docket No. 92-4253

Defendant Directors argue that the district court erred in finding they were individually willfully in contempt of its orders because a contempt finding could not be properly based on conduct and inaction of Defendant *Entities'* counsel, Robol, (as to the Up Treasure inventory) and CPA Alexander (as to his work papers). They asserted below that they were not responsible for the day-to-day operations of CX, relied on CX's employees and accountants for compliance with the Consent Order, did not have personal possession of the companies' original records, and did nothing to interfere with CPA Alexander's efforts, or efforts of other employees, to comply with the Consent Order.

Individual Directors Cullman and Turner also argue that they could not be held in contempt for failure to comply with the Consent Order where their purported noncompliance occurred after

their resignations on October 31, 2005 and November 28, 2006, respectively. We address their

argument first.[5]

**1.**

A party may defend against a contempt order by producing evidence to show that he is

presently unable to comply with the court order. *Gary's Electric*, 340 F.3d at 383; *see also Rolex*

*Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996). Cullman resigned on or about

October 31, 2005, well before entry of the Consent Order on July 20, 2006 (and well before the Ohio

state court cases were removed to federal court on April 24, 2006). R. 69-1/Cullman Aff. Cullman's

affidavit, appended to his June 28, 2006 motion to dismiss, averred that he had no ability to effect

Plaintiffs' access to Defendant Entities' financial records. Plaintiffs cite no authority supporting that

Cullman may be held in contempt for failing to comply with the Consent and other orders when

those orders were entered after he resigned as a Director. Thus, we reverse as to Cullman.

---

[5]Defendant Directors' argument that the district court's award of a monetary judgment contravenes the Delaware Code and CX's Operating Agreement is waived because they cite no authority. *Figueroa-Rubino v. I.N.S.*, 108 F.3d 110, 112 (6th Cir. 1997); *United States v. Bean*, 214 F. App'x 568, 571 (6th Cir. 2007) (unpublished). In any event, the contempt judgment was not based on Defendant Directors' violation of the CX operating agreement, but on their violation of the Consent Order and subsequent orders. The power to punish for contempts is inherent in all courts. *Chambers v. Nasco, Inc.*, 501 U.S. 32, 43 (1991); *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 512 n.7 (6th Cir. 2002).

Defendants' sub-argument that the contempt judgment violated the Delaware Code's provision that a limited liability company alone is liable for its own debts and obligations fails for the same reason.

We affirm as to Director Turner because the district court's contempt award was based in part on conduct that occurred after entry of the Consent Order in July 2006 but before Cullman resigned on November 28, 2006. *See* R. 480 at 3, 15.

**2.**

We review the district court's finding of contempt as to the remaining Defendant Directors for abuse of discretion. *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 550 (6th Cir. 2006). As our sister circuits hold, a district court's finding of contempt deserves special deference consistent with its broad discretion in determining compliance with its orders and sanctioning non-compliance. *See, e.g.*, *Rodriguez v. IBP, Inc.*, 243 F.3d 1221, 1231 (10th Cir. 2001) ("A district court may exercise broad discretion in using its contempt power to assure compliance with its orders."); *E.E.O.C. v. Local 28 of Sheet Metal Workers Int'l Ass'n*, 247 F.3d 333, 335 (2d Cir. 2001) ("In a civil contempt proceeding, the district court has broad discretion to fashion an appropriate coercive remedy based on the nature of the harm and the probable effect of alternative sanctions . . . .") (citation and quotation marks omitted); *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.*, 793 F.2d 1529, 1536 n.8 (11th Cir. 1986) ("A court has broad discretion in fashioning a contempt sanction."); *Delaware Valley Citizens' Council for Clean Air v. Pennsylvania*, 678 F.2d 470, 478 (3d Cir. 1982) ("The standard for our review of a district court sanction for civil contempt is whether the district court abused its wide discretion in fashioning a remedy.").

The Defendant Directors' defiance of a Consent Order issued on July 20, 2006 prompted the district court's contempt finding. The Consent Order—which the Directors individually endorsed—required the Defendants to account for certain disputed documents: "Within sixty (60)

27

days after the entry of this order, Defendants shall provide Plaintiffs' accountant [KPMG] . . . with full access and opportunity to review [certain specified] documents and materials . . . for the purpose of preparing a report . . . of the financial affairs and condition of" the Entities. The Consent Order further compelled "Defendants and their accountant[]," Stephen Alexander, to "provide reasonable cooperation and assistance to [KPMG] in connection with its Report."

The Defendants then took nearly two years to finally produce all the required documents. In the interim, the court repeatedly chastised the Defendants for their delays and non-compliance. At one point, the court issued an order finding "a total lack of good faith of at least CX and RLP in compliance with the" order. In the same order, the district court questioned "the claim by Defendants' counsel that CX and RLP could not locate minutes from Board or Member meetings," which the court described as "basic to the performance of the Defendants' legal obligations in terms of organizational management." The district court also noted the Directors' apparent indifference to the order at an in-court hearing held five months after entry of the Consent Order, warning that "a word to the wise would be in order with regard to the individual defendants" going forward.

Ultimately, the district court ordered that the Defendants be held in contempt for refusing to produce the required documents in a timely manner. In its well-reasoned opinion, the court rejected five contempt allegations but agreed with two: failure to produce recovered-treasure inventories and failure to produce certain accounting work papers. Finding that the individual Directors willfully violated the Consent Order, the court first quoted Justice Hughes in *Wilson v. United States*:

> A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power

28

> for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt.

221 U.S. 361, 376 (1911). It went on to lay out the basis for its finding of contempt:

> The officers and directors of the entities had a clear obligation to comply with the Consent Order entered in this case. The Plaintiffs have shown a clear violation of the Order; thereafter, the Defendants must show that they were unable to comply with the order by demonstrating the impossibility of compliance. *United States v. Rylander*, 460 U.S. 752, 757 (1983).

> No such showing has been made by the entities nor by the officers and directors. The evidence presented by the officers and directors is minimal at best. The record discloses that no formal meetings were held to establish methods of locating or obtaining documents subject to disclosure by the Consent Order. No evidence of follow up on the delivery of documents was presented. No documentation of steps taken to comply with the Consent Order was made part of the record in this case. No officers or employe[e] was designated to comply with requests, as far as the record indicates.

> Instead, the record mainly discloses that Alexander, accountant for the entities, was directed by counsel for RLP and CX, with no direction from the officers or directors. The directions given the accountant, following a number of forewarnings from this Court, have resulted in several previous findings of contempt, as well as the findings herein. The officers and directors were aware of the prior findings of contempt by this Court, yet took no affirmative steps to comply with the Consent Order.

The district court thus concluded that the "individual directors and officers" were "in willful contempt of" the court's prior orders because 1) the Directors "had a clear obligation to comply with the Consent Order"; 2) they failed to comply; and 3) the failure resulted from purposeful inaction. Ample evidence in the record supports each element of the district court's reasoning.

Multiple sources obliged the Directors to comply with the Consent Order. The order individually lists the Directors as parties and each director agreed to be bound by its commands. Separate counsel represented—and still represents—the Directors. The district court's "word to the

wise . . . with regard to the individual defendants" at the November 2006 hearing made it still plainer that the court expected the Directors to personally take steps to ensure compliance with the Consent Order.

Under Delaware law, a corporation's board of directors bears ultimate responsibility for managing the business and affairs of a corporation. DEL. CODE ANN. tit. 8, § 141. CX's charter similarly requires that "[a]ll authority of [CX] . . . be exercised by or under the direction of the Board acting by or through the Chairman of the Board." As the appellees correctly maintain, "[t]his language admits of no doubt: All authority for CX was vested in the Directors, including authority to comply with the Consent Order."

The Supreme Court likewise holds corporate directors responsible, both individually and collectively, for ensuring that the entities they direct comply with court orders:

> When one accepts an office of joint responsibility . . . on a board of directors of a corporation . . . or any other position in which compliance with lawful orders requires joint action by a responsible body of which he is a member, he necessarily assumes an individual responsibility to act, within the limits of his power to do so, to bring about compliance with the order. . . . [T]o hold that, because compliance with an order directed to the directors of a corporation . . . requires common action by several persons, no one of them is individually responsible for the failure of the organization to comply, is effectually to remove such organizations beyond the reach of legislative and judicial commands. This Court and the state courts which have considered the matter have adopted a contrary view.

*United States v. Fleischman*, 339 U.S. 349, 356-58 (1950) (internal citations omitted). Director Turner acknowledged the Board's legal obligations in his deposition, stating that "as a director my responsibility was to compel—have the company produce financial and business records." Against

this background, the district court did not abuse its discretion in holding the Consent Order obliged the Directors themselves to ensure compliance with its demands.

The district court's opinion notes that the Directors 1) never formally met to discuss the Consent Order; 2) never designated any directors or officers to oversee compliance with the Consent Order; and 3) never took any other affirmative steps to comply with the Consent Order.

The deposition testimony of the Director Defendants supports the district court's findings. When asked whether the directors "ever set up a policy or procedure by which the company would report back to the directors as to the status of the production of documents under the Consent Order," Director Defendant Gilman Kirk replied, "No." When asked whether the directors "appoint[ed] anyone to be the responsible person for ensuring compliance with the" Consent Order, Director Defendant Michael Ford said, "Not that I know of." When asked whether he ever spoke with Alexander about the Consent Order, Director Defendant Thomas Thompson answered, "No."

That the Directors lacked personal knowledge of the records' whereabouts is no excuse. Though non-compliance can be excused if compliance is impossible and "lack of possession or control of records" can be grounds for impossibility, *see, e.g.*, *United States v. Rylander*, 460 U.S. 752, 757 (1983), the Directors' ultimate control over the disputed documents cannot seriously be questioned. Alexander and Robol may have been the only individuals who directly accessed the records, but the Directors had the ability to, at the very least, monitor Alexander and Robol and ensure that the Entities complied with the district court's order. Indeed, the Directors' fiduciary duties under Delaware law *required* them to oversee the actions of their officers and employees. *See, e.g.*, *In re Citigroup Inc. Shareholder Derivative Litigation*, 964 A.2d 106, 122-23 (Del. Ch. 2009).

31

Our own longstanding precedent confirms that ignorance is no defense to inaction in the face of a court order. More than 75 years ago, we upheld a district court's finding of contempt against corporate directors who failed to ensure their corporation's compliance with a permanent injunction issued against it in a patent infringement case. *Telling v. Bellows-Claude Neon Co.*, 77 F.2d 584, 586-87 (6th Cir. 1935). In rejecting the directors' ignorance defense, we held:

> That the injunctional order was disobeyed by the corporation, and that it is liable, is not in dispute. That the decree was directed not only to the corporation, but to its officers and agents, and that Telling and Curtis knew its terms, is also not in controversy. It is urged, however, that lack of knowledge on the part of Telling and Curtis that their orders had been disobeyed and their records falsified, and the failure of the evidence to show any willful or contumacious acts upon their part in defiance of the injunction, absolves them from liability. We do not understand, however, that in cases of corporate infringement knowledge of the director or officer charged with infringing that the article manufactured or sold (or leased or serviced) did infringe, is material. Nor is either willfulness or contumaciousness an essential element in civil contempt, however indispensable it may be to a finding of criminal contempt.
> . . . .
> We are not unmindful also that the rule we here apply may in instances prove harsh in placing officers of a corporation endeavoring in good faith to comply with court decree at the mercy of dishonest employees who violate instructions. Safety, however, lies in diligence, and the court is primarily concerned with preserving . . . for the courts a proper respect for their decrees.

*Id.*

Parties to an order must take "*all reasonable steps* within their power to comply with the court's order." *Elec. Workers Pension Trust Fund of Local Union 58, IBEW v. Gary's Elec.*, 340 F.3d 373, 379 (6th Cir. 2003) (emphasis added). The Directors' failure to take meaningful steps to ensure compliance with the Consent Order solidly underpins the contempt judgment of the district court here.

Supreme Court precedent, Delaware law, CX's charter, and the Directors' endorsement of the Consent Order all compelled the Directors to abide by the order's terms. The district court found that despite this clear obligation, the Directors failed to take even modest steps toward ensuring compliance. Finding no grounds to disturb the district court's well-founded exercise of its broad discretion, we affirm the district court's judgment except as to Cullman.

We **AFFIRM** the finding of contempt and award of damages as to Defendants Columbus Exploration, L.L.C. (CX), and Recovery Limited Partnership (RLP), and as to the individual Defendants, with the exception of Cullman.